Opinion issued July 15, 2004











     


In The
Court of Appeals
For The
First District of Texas




NO. 01-02-01250-CR
NO. 01-04-00738-CR




CHRISTOPHER BRYAN TORRES, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 268th District Court
Fort Bend County, Texas
Trial Court Cause No. 35411A




MEMORANDUM OPINION

          A jury found appellant, Christopher Bryan Torres, guilty of two counts of
capital murder and the trial court assessed punishment of confinement for life on each
count.


 In two issues on appeal, appellant contends that the evidence was legally and
factually insufficient to support his conviction.
          We affirm.
BACKGROUND
          On October 1, 2001, Fort Bend County Deputy L. Gage received a dispatch to
investigate a reported explosion. As Gage approached the house at 10027 King
Ranch, he saw an empty shotgun shell, blood, and a hole in the front door. As Gage
entered the house, he heard groaning from a person inside. Gage saw a female, later
identified as Danielle Fleischmann-Arvizu (Danielle), on the floor in the back
bedroom. Danielle appeared to be dead. Gage also saw a male, later identified as
Guillermo Arvizu (Guillermo), dying in the bathroom with his legs extending out into
the back bedroom. Guillermo was the person Gage heard groaning. A firefighter
arrived and Gage asked him to attend to Guillermo. The firefighter directed Gage to
the bathtub, wherein Gage found a female child, who was also dead and who was
later identified as five-year-old Hayley Fleischmann (Hayley). 
          As Gage was looking around the door, a four-year-old female who was behind
the door, later identified as “Gabby,” said repeatedly, “Don’t shoot me.” Gage
testified that Gabby was sitting on the edge of the bathtub with the shower curtain
around her, and that he would not have seen her had she not spoken. Gage handed
Gabby to a firefighter and the firefighter moved Gabby to another part of the house.


 
Then, Gage asked Guillermo several times “who did this?” Guillermo answered, but
the response was distorted because he was gurgling as he spoke. At trial, Gage was
not permitted to imitate the sound Guillermo made, but he testified that it was a word
that began with the letter “L” and ended with “NA”–“a word like Lorna.” Notably,
appellant’s street name was Luna. Also, appellant had a tattoo on his neck with the
word “LUNA.”
          Dr. P. Shroede, assistant medical examiner with the Harris County Medical
Examiner’s Office, performed autopsies on the three victims. Dr. Schroede testified
that Guillermo died from a single shotgun wound to the chest. Danielle, who was
eight to nine months pregnant when she was murdered, died from a single penetrating
gunshot wound to the head from a .380 caliber handgun. Hayley was murdered by
a single perforating gunshot wound to the face from a .380 caliber handgun. 
          Fort Bend County Sheriff’s Sergeant R. Becker processed the crime scene at
the house at 10027 King Ranch. In Sergeant Becker’s opinion, Guillermo was near
the front door in the foyer area when he received a shotgun blast to his midsection.
Becker testified that he believed the shotgun was discharged two times at the front
door. The evidence revealed that one 12-gauge shotgun shell was found outside the
residence directly in front of the front door, and a large number of pellets were found
on the doormat. The storm door was not damaged, but the front door had a hole in
it, as did the window shade on the inside of the front door. Shotgun shell wadding
was located outside the house in the area of the front entryway. Another shot shell
casing and wadding from a 12-gauge shotgun were recovered in the hallway of the
house. Additionally, three .380 casings and a bullet were recovered from the master
bathroom. Thus, a total of five shots, two from a shotgun and three from a .380 gun
were known to have been fired. 
          M. Clements, a firearms examiner for the Harris County Sheriff’s Office,
testified that the three .380 auto cartridge casings were fired from the same weapon.
Clements further testified that three projectiles/bullets recovered were all consistent
with a .380 automatic cartridge, and that, in his opinion, the projectiles were fired
from the same gun. The markings were consistent with being fired from a .380 auto
Sterling Arms brand gun. 
          At the crime scene, Sergeant Becker took photos, blood samples, and blood
swabs. The evidence revealed that appellant’s blood was found on Danielle’s pants.
A mixture of appellant’s blood and Danielle’s blood was found on the outside of the
master bathroom door. A bloody palm print found on the master bath doorway
molding was identified as appellant’s. Appellant’s blood was also found in the
following areas: on the driveway, outside front porch, inside the storm door, outside
the master bedroom door, outside south bedroom wall, and above the master bedroom
light switch. A picture of appellant at a birthday party was retrieved from the house,
showing appellant, Hayley, and Gabby. The picture was admitted into evidence.
          Later that same day, October 1, 2001, Houston police received a report of a
shooting in progress in southeast Houston. HPD Officer D. W. Moore responded and
saw that appellant appeared to be the victim of a gunshot wound. Appellant reported
that an unknown vehicle drove by and shot him as he was walking down the street. 
Further, appellant gave police a description of the car allegedly involved in his
shooting. Officer Moore, however, testified that there was no evidence of a shooting
at the location where appellant said he had been shot. Appellant did not notify police
about any other shootings or victims from the triple homicide.
          Officer Moore testified that appellant had pellet wounds on his arms and chest,
consistent with being hit by a shotgun blast. Appellant was treated for his injuries at
Ben Taub Hospital. Following his arrest on October 10, 2001, photographs were
taken of appellant, showing injuries from shotgun pellets. Appellant also had a bruise
on the finger of his right hand, which Sergeant M. Lorenz testified was indicative of
someone loading a semi-automatic weapon improperly. Lorenz explained that the
slide breech can catch that part of the hand, leaving a blood blister like the one on
appellant’s hand. Lorenz testified that is but one of the ways a person could receive
such a blister.
          At trial, the State presented the testimony of witnesses who were in the
neighborhood at the time of the incident. First, C. Ballard testified that he heard a
loud boom and looking out, saw a black truck parked at a house across the street. 
Further, Ballard testified that he heard a second loud boom, recognized it as a
gunshot, and called police. Ballard saw a black male back the truck out and drive
away, but he could not see how many people were in the truck. Ballard told police
that the truck occupants could have been two black males or a black male and black
female, but at trial, could only recall a black male. 
          Next, C. Wells testified that he heard two “booms” and, after calling police,
saw a black male and a black female standing in the driveway in front of a black
truck. Wells testified that, after he saw the man and woman standing by the truck, he
did not hear any more shots. Wells did not recall what they were wearing. One
deputy testified that Wells told him that he saw a black female coming out of the
house and getting into a car and that he saw a black male come out of the house with
a gun at his side. Wells subsequently identified a black female, Latasha Simmons
(Simmons), from a photo spread. 
          Likewise, D. Urbina testified that he heard two explosions coming from the
house. Urbina testified that, after the second explosion, he saw a male run from the
house to the truck, get into the truck on the passenger side, and then leave. Urbina
described the person he saw get in the truck as Hispanic or white or “mixed,” “kind
of skinny,” and having a short hair cut. Appellant is a Hispanic male. Urbina
testified that he did not see anyone else get into the truck before it left the house. The
truck was subsequently identified as belonging to Steve McKinney, a/k/a Caine
(McKinney), a black male, and an associate of appellant’s. Appellant’s blood was
found on the window tint, passenger door handle, passenger seat floorboard, and
passenger seat of McKinney’s truck.
          Eight days later, on October 9, 2001, McKinney, Simmons, and Lasha Adams
(Adams) were arrested for their involvement in a separate shooting.


 At trial,
Simmons testified that she was currently in jail for the October 9 shooting and that
the State had given her “use” immunity with respect to her testimony in the instant
case. Simmons testified that she was a manic depressant [sic] schizophrenic and that,
a few days prior to the October 1, 2001 shooting, she was in a psychiatric hospital
because she had attempted suicide. She further testified that, on October 1, 2001, she
was using cocaine, Prozac, tricidome [sic], and florazene [sic], and that the drugs left
her feeling woozy and high. 
          Simmons testified that, on October 1, 2001, she, appellant, and McKinney went
to Fort Bend County in McKinney’s black truck. Simmons indicated that McKinney
drove, but that appellant told McKinney how to find Guillermo’s house and offered
to give McKinney gas money. Simmons further testified that appellant explained that
Guillermo did not like strangers coming to his house, but that the door would be
unlocked. Simmons reported that she and McKinney did not know Guillermo, but
that appellant did, and that appellant went into the Arvizu house after McKinney
dropped appellant off at the nearby corner. Simmons testified that she and McKinney
left to get something to eat and then returned to the Arvizu house, pulling the truck
into the driveway. Simmons reported that McKinney was supposed to knock on the
door, and that he took a black bag to the front of the house and knocked on the door. 
          Simmons testified that, after McKinney left her sight, she heard a gun shot,
causing her to get out of the truck and walk toward the front door, but indicated that
she never entered the house. Simmons overheard appellant say, “Man, you shot me.”
She testified that she also heard a little girl crying, saying, “Don’t shoot my mommy.”
Simmons testified that McKinney returned to the truck and got inside, placing a
shotgun on his lap. Simmons indicated that, after McKinney returned to the truck,
they heard two shots. 
          Finally, Simmons testified that appellant returned to the truck, bleeding, and
said, “I just shot the wife and one of the kids in the back of the head.” In her earlier
statement, however, Simmons told police that appellant said, “I shot the bitch in the
head and the baby,” and that appellant thought the little girl was a little boy. When
questioned about the inconsistencies in her statements, Simmons reported that she
was on drugs along with her manic-depressant [sic] medication during her first
statement to police. 
          Like Simmons, Lasha Adams gave a statement to police after she was arrested
for the October 9, 2001 shooting. At trial, Simmons testified that, although she knew
Adams, she never spoke to Adams about the October 1, 2001 murders. To impeach
Simmons, however, defense counsel called Adams to testify. Adams testified that she
had previously manufactured and delivered narcotics. Adams further admitted that
she had a history of shoplifting, narcotics possession, and robbery. Adams testified
that Simmons told her that Simmons and her boyfriend [McKinney] had killed three
Mexicans [sic] because “they kept lying to them.” Specifically, Adams testified that
Simmons told her that Simmons had killed the man and that McKinney killed the
other two. Adams indicated that Simmons said she had the “little gun” and that
McKinney had the “rifle.” 
          The State presented the testimony of Deardis Scott, who had recently pled
guilty to possession of a controlled substance. Scott knew appellant as “Luna.” Scott
testified that, in the weeks leading up to the incident, appellant repeatedly offered to
buy Scott’s .380 caliber handgun, because he had a “big lick” coming up, meaning
that appellant had to “hit a robbery or come up on a numerous amount of money.” 
Additionally, the State presented the testimony of Lorenzo Butler, another of
appellant’s associates, who was incarcerated at the time he was subpoenaed to testify
in the instant case. Butler testified that, prior to the incident, appellant took Scott’s
handgun, placed it in a black bag, and then left their location.
          After his arrest, appellant wrote a series of letters. In one letter, appellant
acknowledged his presence at the Arvizu house on October 1, 2001, writing, in part:
My motive for being at the Arvizu residence on 10-1-01 was to do
“something” so that later on I could do “something else” that was for the
benefit for the sheep. . . Then when everything that occurred at the
Arivzu residence on 10-1-01 is revealed, they will see my intentions of
what I was striving to accomplish but just did not know what the end
result was what it was. . . . They will understand my responsibility and
if they were in my shoes they would have probably done the same thing.

McKinney also provided letters he received from appellant, wherein appellant wrote,
“I personally forgive you for shooting me.” 
DISCUSSION
Sufficiency of the Evidence
A.      Standards of Review
          A legal-sufficiency challenge requires us to determine whether, after viewing
the evidence in the light most favorable to the verdict, any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt. Johnson
v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); Howley v. State, 943 S.W.2d 152,
155 (Tex. App.—Houston [1st Dist.] 1997, no pet.). We note that, as the exclusive
judges of the facts, the credibility of the witnesses, and the weight to be given their
testimony, the jury may believe or disbelieve all or any part of a witness’s testimony. 
Penagraph v. State, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981) (opining that “a
jury is entitled to accept one version of the facts and reject another or reject any of a
witness’s testimony”). 
          We review the factual sufficiency of the evidence by reviewing all of the
evidence as a whole neutrally, not in the light most favorable to the prosecution. 
Johnson, 23 S.W.3d at 7. In a factual-sufficiency review, we may not substitute our
own judgment for that of the fact finder. Jones v. State, 944 S.W.2d 642, 648 (Tex.
Crim. App. 1996). The Court of Criminal Appeals has recently stated:
There is only one question to be answered in a factual-sufficiency
review: Considering all of the evidence in a neutral light, was a jury
rationally justified in finding guilt beyond a reasonable doubt? 
However, there are two ways in which the evidence may be insufficient. 
First, when considered by itself, evidence supporting the verdict may be
too weak to support the finding of guilt beyond a reasonable doubt. 
Second, there may be both evidence supporting the verdict and evidence
contrary to the verdict. Weighing all evidence under this balancing
scale, the contrary evidence may be strong enough that the beyond-a-reasonable-doubt standard could not have been met, so [that] the guilty
verdict should not stand. This standard acknowledges that evidence of
guilt can “preponderate” in favor of conviction but still be insufficient
to prove the elements of the crime beyond a reasonable doubt. Stated
another way, evidence supporting guilt can “outweigh” the contrary
proof and still be factually insufficient under a beyond-a-reasonable-doubt standard. 

Zuniga v. State, No. 539-02, 2004 WL 840786, at *7(Tex. Crim. App. Apr. 21, 2004).
We must consider the most important evidence that the appellant claims undermines
the jury’s verdict. Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). 
B.      Capital Murder
          Under the law applicable in this case, a person commits the offense of capital
murder if he intentionally commits murder in the course of committing or attempting
to commit kidnapping, burglary, robbery,


 aggravated sexual assault, arson, or
obstruction or retaliation. Tex. Pen. Code Ann. § 19.03(a)(2) (Vernon Supp. 2004). 
Further, a person commits the offense of capital murder if he murders more than one
person during the same criminal transaction, or if he murders an individual under six
years of age. Tex. Pen. Code Ann. § 19.03(a)(7-8) (Vernon Supp. 2004). 
          Under the law of parties, a person is “criminally responsible as a party to an
offense if the offense is committed by his own conduct, by the conduct of another for
which he is criminally responsible, or by both.” Tex. Pen. Code Ann. § 7.01
(Vernon Supp. 2004). A person is “criminally responsible” for an offense committed
by the conduct of another if, acting with intent to promote or assist the commission
of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person
to commit the offense. Tex. Pen. Code Ann. § 7.02(a)(2) (Vernon Supp. 2004). 
          In determining whether a person is a party to an offense, the fact finder may
examine the events occurring before, during, and after the commission of the offense. 
Wygal v. State, 555 S.W.2d 465, 468-69 (Tex. Crim. App. 1977); Diaz v. State, 902
S.W.2d 149, 151-52 (Tex. App.—Houston [1st Dist.] 1995, no pet). Circumstantial
evidence may be sufficient to show that one is a party to the offense. Wygal, 555
S.W.2d at 469. Mere presence alone will not make one a party to an offense;
nevertheless, it is a circumstance tending to prove that a person is a party to the
offense, and, when taken with other facts, may be sufficient to show that he was a
participant. Id. at 469, n.3. 
          Evidence is sufficient to support a conviction under the law of parties where
the actor is physically present and encourages the commission of the offense, either
by words or agreement. Diaz, 902 S.W.2d at 152. An agreement of parties to act
together in a common design can seldom be proved by words, but reliance can often
be had on the actions of parties showing an understanding and a common design to
do a certain act. Wygal, 555 S.W.2d at 469. Evidence that a defendant drove the
getaway car after a robbery has been held sufficient to convict the driver as a party
to the offense. See Thompson v. State, 697 S.W.2d 413, 417 (Tex. Crim. App. 1985);
Brewer v. State, 852 S.W.2d 643, 647 (Tex. App.—Dallas 1993, pet ref’d). 
C.      Legal Sufficiency of the Evidence
          In his first point of error, appellant contends that the evidence was legally
insufficient to support his conviction. Specifically, appellant contends that a rational
trier-of-fact could not have found the essential elements of the crime beyond a
reasonable doubt.


 
          The indictment in the instant case alleged that appellant, in the course of
attempting to commit and committing robbery of Guillermo Arvizu and Danielle
Fleischmann-Arvizu, intentionally committed murder by causing the deaths of those
individuals, Guillermo Arvizu and Danielle Fleischmann-Arvizu, by shooting them
with a firearm. The indictment further alleged that appellant intentionally and
knowingly caused the death of Hayley Fleischmann, an individual under six years of
age, by shooting her with a firearm. The jury charge authorized the jury to find
appellant guilty of the offenses alleged either by his own actions or as a party to the
offenses. 
          The evidence shows that Guillermo was murdered by a shotgun wound. 
Appellant was hit with shotgun pellets during the incident and, as a result, appellant’s
blood was found near Guillermo’s body, all over the Arvizu house, and in the black
truck. Appellant lied to police about his injuries. Appellant also had a bruise on his
right hand consistent with loading a semi-automatic weapon improperly. Danielle
and Hayley were each murdered by a gunshot wound to the head from a .380 caliber
handgun, a type of semi-automatic weapon. 
          Further, the State presented witnesses who testified that appellant had
attempted to buy, and then later stole, a .380 caliber handgun for an upcoming “big
lick.” Other evidence showed that appellant knew the Arvizu family and the location
of their house, and told McKinney that the door would be unlocked. Appellant
directed McKinney to the Arvizu house and, because appellant knew that Guillermo
did not like strangers coming to his house, appellant initially entered the house alone. 
In his dying declaration, Guillermo uttered that it was “L –NA” who committed the
crime. Appellant’s street name was Luna, and “Luna” was tatooed on appellant’s
neck.
          The jury found appellant guilty of the capital murders of Guillermo Arvizu and
Hayley Fleischmann. Viewing the evidence in the light most favorable to the verdict,
we hold that a rational trier of fact could have found that appellant intentionally
murdered Guillermo in the course of attempting to commit and committing robbery
of Guillermo and Danielle, and that appellant intentionally murdered five-year-old
Hayley Fleischmann, either by his own actions or as a party to the offenses. 
Accordingly, we hold that the evidence was legally sufficient to support appellant’s
conviction for capital murder. 
          We overrule appellant’s first point of error.
D.      Factual Sufficiency of the Evidence
          In his second point of error, appellant contends that the evidence was factually
insufficient to support his conviction. First, appellant contends that “the reliance
upon the dying declaration of [Guillermo] should be reconsidered.” Appellant also
asserts that, because appellant was shot alongside Guillermo when McKinney sent the
shotgun blast through the door, there is no way that appellant could have shot
Guillermo. 
          As noted above, at trial, Deputy Gage testified that, as Guillermo lay dying
from a shotgun wound to the chest, Guillermo responded to his inquiry, “Who did
this?” with a sound that began with the letter “L” and ended with “NA.” Gage
testified that Guillermo’s response was distorted due to gurgling noises, but that it
was “a word like Lorna.” The record reveals that appellant’s street name was Luna,
and that appellant had a tattoo on his neck with the word “LUNA.” After weighing
this evidence, the jury determined that the evidence supported the finding of guilt
beyond a reasonable doubt. We must defer to the fact finder’s determinations,
particularly those concerning the weight and credibility of the evidence. Johnson, 23
S.W.3d at 9. The jury was entitled to believe the events took place as Gage testified
and that Guillermo was attempting to vocalize “Luna” with his dying breath. We will
not substitute our judgment for that of the jury. Zuniga, 2004 WL 840786, at *4. 
          Second, appellant asserts that “any testimony from Simmons is completely
unreliable.” Specifically, contends that Simmons is a liar and “very likely the actual
killer of Danielle and [Hayley].” Appellant argues that, on the day of the offense,
Simmons was “high on crack and psychiatric medicine.” Further, appellant asserts
that Simmons perjured herself when testifying that she was never inside the Arvizu
house because State witnesses established that she was in the house. Finally,
appellant argues that Simmons’s statements that appellant said he shot a little boy
were “completely outside the scope of any rationality” because, as a “friend of the
family,” appellant knew that there were two girls, and, had appellant been trying to
kill any witnesses, he would have known to look for Gabby.


 
          The record indicates that appellant called Simmons as an adverse witness. 
Simmons testified that, on October 1, 2001, she was “feeling woozy and high” from
cocaine and psychiatric medications. Simmons testified that she never entered the
Arvizu house; however, a deputy testified that State’s witness Wells told him that he
saw a black female coming out of the house and getting into a car, and the record
indicates that Wells subsequently identified Simmons from a photo spread. When
questioned about the inconsistencies in her statements, Simmons reported that she
was using narcotics, along with her manic-depressant [sic] medication, during her
first statement to police.
          Thus, the jury heard Simmons admit to being under the influence of legal and
illegal narcotics both at the time of the incident and at the time of her statement to
police. The jury also heard Simmons explain that the inconsistencies in her prior
statements were the result of her narcotics usage. Finally, the jury heard the
testimony that appellant asserts is contradictory: (1) Simmons’s testimony that she
heard two shots after she and McKinney got back into the truck and (2) witness
Wells’s testimony that he did not hear any more shots after he saw a black male and
black female standing by truck. 
          As the exclusive judges of the facts, the credibility of the witnesses, and the
weight to be given to their testimony, the jury was free to believe or disbelieve all or
any part of Simmons’s testimony. See Penagraph, 623 S.W.2d at 343; Escovedo v.
State, 902 S.W.2d 109, 115 (Tex. App.—Houston [1st Dist.] 1995, pet. denied). It
was within the province of the jury to reconcile the conflicts and contradictions in the
evidence. See Chiles v. State, 988 S.W.2d 411, 415 (Tex. App.—Houston [1st Dist.]
1999, pet. ref’d). After weighing Simmons’s testimony, the jury determined that the
evidence supported the finding of guilt beyond a reasonable doubt. We will not
substitute our judgment for that of the jury. Zuniga, 2004 WL 840786, at *4. 
          Next, appellant contends that the State’s witnesses, Scott and Butler, were
“completely undermined in their testimony regarding appellant.” Effectively,
appellant is attacking the credibility of both Scott and Butler. When a jury’s
determination depends primarily on its evaluation of a witnesses’ demeanor and
credibility, it is entitled to almost total deference. Johnson, 23 S.W.3d at 8-9. In the
instant case, the jury was free to believe or disbelieve all or any part of the testimony
of Scott and Butler. See Penagraph, 623 S.W.2d at 343; Escovedo, 902 S.W.2d at
115. We defer to the jury’s decision.
          Finally, appellant asserts that his innocence was established by a videotaped
interview of four-year-old Gabby. Appellant contends that Gabby witnessed the
killings and was “cognizant enough to know that she could have been shot.” 
Appellant asserts that, on the tape, Gabby is clear that it was strangers who shot her
family. The record shows that the trial court admitted Gabby’s videotaped interview
into evidence and allowed the State to publish it for the jury. Thus, the jury saw four-year-old Gabby questioned about the day her mother, father, and sister were
murdered. It was within the province of the jury to reconcile the conflicts and
contradictions in the evidence. See Chiles, 988 S.W.2d at 415. We defer to the jury’s
decision.
          Examining all of the evidence neutrally, we hold that the proof of guilt was not
so obviously weak as to undermine confidence in the jury’s determination; nor was
the contrary evidence so strong that the beyond-a-reasonable-doubt standard could
not have been met. Accordingly, we overrule appellant’s second point of error.
CONCLUSION
          We affirm the judgment of the trial court.
 
 

                                                             Sherry Radack
                                                             Chief Justice
 
Panel consists of Chief Justice Radack and Justices Keyes and Bland.
Do not publish. Tex. R. App. P. 47.2(b).